IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| EXTRUDED ALUMINUM CORPORATION, individually, and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>THE GOLDMAN SACHS GROUP, INC.; GS POWER HOLDINGS LLC; MCEPF METRO I, INC.; MITSI HOLDINGS LLC; METRO INTERNATIONAL TRADE SERVICES LLC; LONDON METAL EXCHANGE LIMITED, LME HOLDINGS LIMITED; AND JOHN DOES 1-10<br><br>　　　　　Defendants. | Case No. _____<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff complains, upon knowledge as to itself and its own acts, and upon information[1] and belief as to all other matters, as follows:

## I.　　SUMMARY OF ALLEGATIONS

1.　　In violation of Sections 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C §§1 and 2, the Goldman Sachs Defendants ("Goldman"), the London Metal Exchange Defendants ("LME"), and other Defendants have, from February 1, 2010 forward (the "Class Period"), combined, conspired or agreed with one another and other persons to restrain aluminum supplies in LME Detroit Warehousing and inflate aluminum prices, including the

---

[1] The information is based upon the investigation of counsel from publicly available information about aluminum prices, the Midwest premium prices, data on aluminum load-in and aluminum load-outs, other statistics, news articles, and analysis.

Platts MW Midwest Premium or Midwest Premium or Midwest Transaction premium price.  The
Midwest Premium or Platts MW Midwest Premium or Midwest Transaction Price or the Platts
Metals Weekly Premium or similar terms are hereinafter collectively referred to as "the Midwest
Premium or the Platts MW Premium."  This premium is a standard contract benchmark price
term for purchasing and selling physical aluminum in Michigan, Ohio, Wisconsin, Indiana,
Illinois, Minnesota, contiguous and other areas of the U.S.

2.      The purposes of the antitrust laws have been to reduce prices, increase product,
improve efficiency, and improve quality. By restraining supplies and inflating prices, Defendants
have violated the first two of these purposes.  The means which Defendants have employed to do
so, have included agreements to permit or operate in an extremely inefficient manner and to
provide extremely low quality of service in the sensitive area of warehousing. Thereby,
Defendants' intentional conduct has been *per se* unlawful, deleterious to all of the purposes of
the antitrust laws, inherently suspect, and grossly unreasonable.

3.      (a) There have been repeated and ongoing public complaints since early 2011 that
Defendants were inflating aluminum prices.  Despite these complaints, Defendants intentionally
continued, in order to profit themselves, to perform their agreements and engage in their conduct
to restrain aluminum supplies and inflate aluminum prices.  Based upon the repeated public
complaints and other information, the Defendants had complete knowledge that they were
inflating aluminum prices and injuring persons who paid those prices, especially the Platts MW
Premium and Midwest Premium price.

(b) In performing their agreements and carrying out the unlawful conduct, Defendants
have fully known of and specifically intended to cause such price inflation and such injuries to
persons, like Plaintiff, who have paid the inflated prices.

2

(c) However, after increasingly intensive recent government scrutiny, Defendants have reversed themselves.  Defendants belatedly took steps on July 31, 2013 to terminate some of the conduct by which Defendants were intentionally restraining aluminum supplies, inflating aluminum prices, and intentionally injuring the persons who paid the inflated aluminum prices. Defendants' belated steps include steps that Defendants had previously jointly or individually either refused to take or said that they could or should not take.

4.       During the Class Period, the LME has held the sensitive position of controlling (a) exchange-traded aluminum forward or futures contracts in the U.S., and (b) warehousing of exchange-traded aluminum in the U.S. including in the Midwest and the greater Detroit, Michigan area ("LME Detroit Warehousing").  The LME's monopoly over the trading of aluminum forward or futures contracts in the United States during at least February 1, 2010 until the present ("Class Period") included capturing approximately 97-99% of the trading in such contracts.  The LME has approved and made agreements with the LME certified warehouse owners who held, due to the unlawful conduct alleged herein, a growing portion of the aluminum stored in the United States. This is estimated to be 50% or more of all such aluminum in warehouse storage in the U.S. and a significantly greater percentage of all the aluminum in those parts of the U.S. that purchase and sell aluminum on the Midwest Premium or Platts MW Premium.

5.       During the Class Period, Goldman has held the sensitive position of having a monopoly over LME-approved warehousing space for deliveries on LME aluminum and other metals contracts in LME Detroit Warehousing.  Goldman purchased, at the start of the Class Period, warehouses with more than 80% of the storage space in the Detroit area. Goldman has continued to own same throughout the Class Period.  Goldman's unlawful conduct alleged herein

has leveraged that monopoly into a position in which Goldman, by itself, stores approximately well over 50% of the aluminum stored in warehouses located in those parts of the U.S. that transact based on the Midwest Premium or Platts MW Premium.

6.    (a) Through an interconnected series of agreements in unreasonable restraint of trade, Goldman and the LME restrained approximately 1.5 million tons of aluminum in LME Detroit Warehousing.

(b) This constitutes more than 75% of the LME aluminum in storage in the United States. It is estimated to constitute more than 50% of the total aluminum in warehouse storage in the United States.  As a result of the large amount of aluminum in storage in Goldman's LME Detroit Warehousing and Defendants' unlawful agreements, it reportedly took in June 2013 as long as sixteen months for a customer to receive their aluminum from the time they order such aluminum to be loaded out of the Detroit warehouse until the time of actual delivery.

(c) Having inefficiently and unreasonably imposed the deadweight loss on the economy of greatly prolonged durations of storage of aluminum and great increases in unnecessary storage bills, Defendants further agreed to charge far above the market rate for such storage.

(d) Defendants have generated hundreds of millions of dollars per year in storage revenues during their regime of artificially high storage rates and grossly inefficient and artificially long delays in loading out aluminum.  These extraordinary revenues from inefficiencies and deadweight restraints on the economy are reflections of Defendants' extreme monopoly pricing power and abusive agreements in very unreasonable restraint of trade.

7.    Subsidized and incentivized by their supra-competitive storage revenues from their foregoing "get paid more to do less" inefficiency agreements, Goldman --- with the

knowledge, consent and agreement (and to the profit) of the LME --- also has leveraged its agreements with the LME as follows.  Goldman has made a series of second level agreements in unreasonable restraint of trade.  In this second level of agreements, Goldman has overbid other market participants and further inflated aluminum prices as a means to attract and divert additional aluminum in the Midwest U.S. to store in its LME Detroit Warehousing.

8.      Goldman has done so by offering incentives of up to $250 or more per ton to firms to store aluminum in LME Detroit Warehousing for long periods.  These incentive payments have directly caused the inflation of aluminum prices as a prior and necessary step in order for Defendants to attract and obtain the aluminum, and then to divert it into the LME Detroit Warehousing.  This second level of agreements has further "inextricably intertwined" the injuries that Defendants have intentionally caused through their aluminum price inflation, with Defendants agreement to restrain aluminum supplies.

9.      (a) Defendants' combinations of their foregoing unreasonable "get paid more to do less" agreements, and Goldman's overbidding and diversion agreements have reduced aluminum supplies and shifted the supply curve of aluminum available for sale.  As a result, there has been substantially less aluminum available for sale in the United States especially in Michigan, Ohio, Indiana, Wisconsin, Illinois, Minnesota, contiguous and other areas.  And there has been substantially more aluminum restrained in LME Detroit Warehousing incurring inflated storage rates.

(b) For example, from 2009-2013, the amount of aluminum stored in LME non-Detroit warehouses in the U.S. has **declined** by 50%.  This decrease is less than in sync with and less than an accurate reflection of the amount that should have been reduced in times of economic improvement.  The less than normal reduction was due to some mimicry in non-

Detroit locations of the Goldman-LME conduct in Detroit.  Distorting the U.S. economy further, however, Goldman's "get paid more to do less" agreements with the LME and Goldman's "diversion" agreements with others, have caused the amount of aluminum trapped in LME Detroit Warehousing to **increase,** not decrease, and to increase by more than **60%**.  This large contra-economic trend increase, has restrained and trapped such a large portion of the available U.S. supplies of aluminum that it has been inflating aluminum prices since 2010.

(c) Consistent with the essential services of warehouses, a large amount of aluminum built up in LME Detroit Warehousing during the 2008-2009 vicious slowdown in the economy.  If, during the economic recovery of 2010-2013, such aluminum had not been unreasonably restrained by Defendants' agreements in unreasonable restraint of trade, then the amounts stored in Detroit would normally have declined from approximately 900,000 to much less than 400,000 tons.  Instead, the amount of aluminum in storage has increased from approximately 900,000 tons to well in excess of 1,400,000 tons such that approximately 50% or more of the warehouse stored aluminum in the United States is now stored in the LME Detroit Warehousing (and approximately 75% of the LME aluminum stored in the United States is restrained and stored in Detroit).  This directly encouraged others to begin to mimic the Goldman/LME formula which further distorted the U.S. economy.

(d) The U.S. produces approximately 5,500,000 tons of aluminum per year, and net imports 500,000 tons per year.  Thus, Defendants have restrained in Detroit three times the **annual** net imports of aluminum and 27-plus percent of the ENTIRE annual production of aluminum.  These extraordinary changes, at the margin, in the available supply of aluminum caused by Defendants, have greatly inflated aluminum prices.

10.     Also, Defendants' diversion agreements have increased demand for aluminum and shifted the aluminum demand curve by, in effect, creating a new "storage demand" to stockpile aluminum.  This has prevented aluminum from being efficiently sold for productive uses at competitive prices.  Instead, it has caused aluminum to be sold for productive uses only at inflated, higher prices.  And it has restrained aluminum uselessly in order to incur unnecessary storage bills for which low quality storage services were provided.

11.     (a) By directly shifting both the supply and demand curves for aluminum prices, Defendants' agreements have increased aluminum prices including the Midwest Premium or Platts MW Premium price for aluminum.

(b) Thus, despite repeated public complaints since late 2010 or early 2011 that Defendants were inflating aluminum prices, Defendants have knowingly persisted in continuing to perform their agreed upon supply-reducing, demand-increasing, and overbidding steps. Thereby, Defendants have, for example, caused the inflation of the Platts MW Premium or Midwest Premium prices for aluminum to increase to repeated all-time record highs:

| February 2010 | 6.1430 ¢ per pound |
| February 2011 | 6.3500 ¢ per pound |
| June 2011 | 8.8056 ¢ per pound |
| February 2013 | 11.6500 ¢ per pound |
| Post-February 2013 | 12.0 ¢ per pound (and higher) |

(c) The means that Defendants used in order to cause the price inflation have been overbidding to induce storage, substantial reductions in available aluminum, extreme inefficiency in load-outs, and low quality service for warehousing. All of these means are deleterious to the purposes of the antitrust laws.

12.     Both **the large increases in the amounts** of aluminum in storage in Defendants' LME Detroit Warehousing and the repeated record-breaking increases in the Midwest Premium

or the Platts MW Premium, have been directly contrary to economic circumstances EXCEPT for the artificial circumstances that Defendants have injected into the supply-demand curve for aluminum by their agreements in unreasonable restraint of trade.

13.     (a) Far from dissociating itself from Goldman's anticompetitive conduct, the LME has, notwithstanding repeated public complaints that the Goldman/LME conduct was inflating aluminum prices, continued to make and perform its agreements with Goldman.  Also, the LME has made positive public statements since 2011 that have caused, continued to cause, and empowered Goldman to exacerbate the price inflation, the restraints of aluminum supplies, and the other deleterious conduct alleged herein.

(b) In response the complaints about high prices, the LME has stated, per Chris Evans, in New York during January 2013, that purchasers of aluminum supposedly should simply stop paying the high prices.  In effect, the LME encouraged users to starve themselves of aluminum (and, impliedly, to lay off workers) so that Goldman and the LME could increase their stockpile of aluminum and their resulting supracompetitive storage revenues.

14.     Contrary to the LME's classic monopolistic and anticompetitive statements, however, Ford, General Motors, Coca-Cola, Pepsi, Anheuser-Busch, MillerCoors, Novelis and other users of aluminum who have complained about Defendants' practices do not have to further restrain trade and lay off their workers so that Defendants' unlawful agreements and abuses of their monopoly powers alleged herein, may continue.

15.     The Defendants agreed to and did abuse their respective monopoly powers over these sensitive, essential areas of commerce.  Defendants did so in order to inflate their revenues, profits, and aluminum prices, including the Midwest Premium or Platts MW Premium prices of aluminum.

16.     Multiple facts alleged herein plausibly indicate that the LME Defendants and the Goldman Defendants did enter their alleged agreements in restraint of trade.  Some but not all of such facts include those alleged below.  **First**, plausibly indicating the existence of such agreements, portions thereof are reflected in written LME documents and releases, or have been acknowledged in statements to the public by Defendants.

17.     (a) **Second**, further adding to the plausibility of the existence of such agreements, Defendants have had a shared, common financial motive to make such agreements.  The LME reportedly receives 1.0% of the total storage fees charged by LME warehouses. This includes 1.0% of revenues realized from the LME Detroit Warehousing.

(b) For most of the Class Period, the largest shareholders of the Defendant LME Holdings Limited were the Goldman Defendants, and other financial firms which owned LME approved warehouses.  *See* sub-paragraph "(e)" below.  The Goldman Defendants and these other financial firms could and did direct, as traders and as intermediaries, large amounts of business to the LME (or away from the LME).

(c) In entering and successfully performing the unlawful agreement alleged herein, the LME had a strong financial motive to inflate their storage revenues not only for LME Detroit Warehousing, but, indirectly, for other warehousing as well.

(d) Such prospect of increasing revenues for the LME supplied Defendants with an additional motive to make the agreements here.  That was, Defendants were looking to sell the LME from Defendant LME Holdings Inc., to a new buyer.  The prospect of increasing warehouse revenues arose from a shift that Goldman (as a "master of the universe" investment bank) was encouraging in the function of the U.S. economy.  That shift was to enrich warehouses and banks rather than efficiently market commodities.  This incipient shift enabled Defendants to

project cash flows and sell the LME to Hong Kong Exchanges & Clearing Ltd. ("HKEx") for $2.15 billion. Goldman's stake in the LME was valued at $208 million at that purchase price.

(e) Until the sale of Defendants' LME Holdings to HKEx, Goldman was the second largest shareholder of Defendant LME Holdings. Goldman held approximately 1.23 million shares which comprised approximately 9.5% of the shares. The LME had, at that time, an incentive to accommodate Goldman and other large warehouse owners who were large shareholders of the LME and also brought customers to the LME. In fact, JP Morgan was the largest LME shareholder with approximately 1.4 million ordinary shares (approximately 11%) and also owned LME approved warehouses. During the Class Period, JP Morgan owned LME warehouses in Baltimore, Chicago, New Orleans, Liverpool, Hull (Immingham), Bilbao, Trieste, Antwerp, Rotterdam, Singapore, Busan, Gwangyang, and Johor (Pasir Gudang).

(f) Other large shareholders of LME Holdings included Metdist 9.39%, UBS 4.26%, Citigroup 2.32%, Merrill Lynch 2.32% Morgan Stanley 2.32%, Koch Metals 2.32%, and Jeffries Bache 1.93%.

18. **Third**, also plausibly indicating the agreements alleged herein, Defendants' parallel conduct has caused a historically unprecedented movement to all time record levels in the Midwest Premium and Platts MW Premium aluminum prices. No fundamental economic forces exist to cause such a move. In fact, Defendants have caused that movement to continue for an extended period of time and to extend to increasingly higher all-time record levels in economic circumstances that indicate that no such premium should exist.

19. **Fourth**, also indicating the plausibility of the existence of Defendants' agreement, Defendants have continued their course of highly unusual parallel conduct notwithstanding an extremely high degree of public complaints that Defendants were causing inflated aluminum

prices.  With full knowledge that they were inflating such prices, Defendants have modified such course of conduct only to the most superficial extent in order to rationalize some response to the public protests.  But Defendants have continued to cause record inflations in the Midwest Premium or Platts MW Premium.

20.     **Fifth**, further plausibly indicating the existence of an agreement among Defendants, economically anomalous and historically unprecedented changes in the amounts of LME Detroit Warehousing aluminum storage have occurred in economic conditions in which such changes made no sense whatsoever.

21.     **Sixth**, Defendants have engaged, sometimes jointly and sometimes individually, in a series of highly unusual parallel acts that could not be taken without one another's consent. These joint, coordinated or individual steps were required to provide and have provided the mutual benefits alleged herein.

22.     **Seventh**, further plausibly indicating an agreement, government investigations of Defendants' conduct began to be announced by the European Union in November 2012.

23.     **Eighth**, further plausibly indicating the existence of the agreements alleged herein, Goldman's head aluminum trader Scott Evans, departed Goldman after the announcement of the EC investigation.

24.     **Ninth**, further adding to such plausibility, Goldman, after the announcement of such EC investigation, announced plans to sell its LME Detroit Warehousing.

25.     **Tenth**, the LME, before the acquisition by HKEx, and while still under the leadership of CEO Martin Abbott, argued that the year-long Detroit load-out queues were part of the economic environment, and that it was not the LME's place to agree to reduce or forcibly reduce them.

11

26. **Eleventh**, after Mr. Abbott's resignation in June 2013, the new LME regime (under HKEx's ownership), on July 1, 2013 proposed changes in load-out rules that would force warehouses with queues of at least 100 days (*i.e.*, Defendant Metro) to deliver metal out at a rate of at least 1,500 tons per day **more than** is brought in.

27. **Twelfth**, in July 2013 Goldman, under the foregoing intensifying investigations by U.S. authorities and after the LME's change in the load-out rates, announced that it was suspending the incentive payments it made to attract metal to their LME Detroit Warehousing.

28. **Thirteenth**, after further increases in U.S. government scrutiny, on July 31, 2013, Goldman announced that it would release the aluminum in its LME Detroit Warehousing.

29. **Section 1 Violations**. The Goldman Defendants' agreements with one another, the LME Defendants and the John Doe Defendants constitute *per se* violations of Section 1 of the Sherman Act as well as extremely unreasonable agreements, conspiracies or combinations in restraint of trade, which were designed to and did directly fix, maintain and inflate the prices of aluminum.

30. **Section 2 Violations**. The London Metal Exchange Defendants and the Goldman Defendants have each anti-competitively abused their respective monopoly powers in violation of Section 2 of the Sherman Act. Separately and additionally, they have also agreed, in violation of Section 2, with one another and others to abuse such monopoly power to their mutual benefit.

31. Defendants' violations alleged herein have foreseeably, anti-competitively, and unreasonably inflated prices and restrained access to, and alienation, output, use and consumption of substantial portions of U.S. aluminum supplies in the Detroit area, the Midwest, and, indeed, the entire U.S.

32. **Injury and Damages**.

12

(a) By restraining additional supplies in the LME Detroit Warehousing, by diverting aluminum from productive uses into the LME Detroit Warehousing, by inflating prices (including the Midwest Premium or Platts MW premium price), and by their other conduct, Defendants have directly and intentionally injured persons, such as Plaintiff, who purchased aluminum in Michigan, Ohio, Wisconsin, Indiana, Illinois Minnesota, contiguous and other parts of the United States at the inflated prices, including the Midwest Premium or Platts MW premium prices.

(b) As a direct result of Defendants' foregoing violations, Defendants have inflated their revenues from their Detroit Warehousing, and proximately and foreseeably caused Plaintiff and members of the Class to suffer injury including by paying higher prices, including higher Midwest Premium or Platts MW Premium prices for aluminum.

## II.     JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1332, and 15 U.S.C. §§7, 15(a), and 26.

34.     Venue is proper in this District pursuant to 15 U.S.C. §§1, 2, 7, 15, 22 and 26 and 28 U.S.C. §1391 because Defendants are found in, reside, or transact business in this District.

## III.     PARTIES

### A.  Plaintiff

35.     Plaintiff EXTRUDED ALUMINUM CORPORATION ("Plaintiff") was damaged in its property or business by purchasing aluminum based upon Midwest Premium or Platts MW Premium (including the Platts Metals Week or metals weekly premium price) or the Midwest Transaction price that were intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Plaintiff has directly suffered antitrust injury by transacting in the relevant

market in which Defendants were intentionally inflating prices.  Plaintiff is located at 7200 Industrial Drive, Belding, Michigan, 48809.

**B. Defendants**

36.    Defendant THE GOLDMAN SACHS GROUP, INC. ("Goldman Sachs") is a leading global investment banking, securities, and investment management firm that provides a wide range of financial services to a substantial and diversified client base.  Goldman Sachs is located at 200 West Street, New York, NY 10282.

37.    Defendant GS POWER HOLDINGS LLC ("GS Power Holdings") is a wholly-owned subsidiary of Goldman Sachs.  It is a Delaware limited liability company located at 85 Broad Street, New York, NY 10004.

38.    Defendant MCEPF Metro I, Inc. ("MCEPF Metro I") is a wholly-owned subsidiary of Goldman Sachs.  It is a Delaware corporation with a registered address of 160 Greentree Drive, Suite 101, Dover, DE 19904.

39.    MITSI HOLDINGS LLC ("Mitsi") is a Delaware limited liability corporation located at 39533 Woodward Ave., Suite 170, Bloomfield Hills, Michigan 48304.  It is co-co-owned by GS Power Holdings and MCEPF Metro I, each of which is wholly-owned by Goldman Sachs.

40.    Defendant METRO INTERNATIONAL TRADE SERVICES LLC ("Metro International") is a Delaware limited liability corporation with a registered address at 39533 Woodward Ave., Suite 170, Bloomfield Hills, Michigan 48304.  Its headquarters are located at 6850 Middlebelt Road, Romulus, Michigan 48174.  Metro International is owned directly by Mitsi and operates as a subsidiary of Goldman Sachs, which owns Mitsi through its ownership of GS Power Holdings and MCEPF Metro I, each of which is wholly-owned by Goldman Sachs.

41.     Metro International is a global warehouse operator, specializing in the storage of non-ferrous metals, including aluminum, for the London Metal Exchange. Metro International is an LME-approved warehouse. Metro International was acquired by Goldman in February 2010. As of March 8, 2013, Metro International operated 29 out of a total of 37 LME-listed storage facilities in Detroit, Michigan.

42.     Goldman Sachs, GS Power Holdings, MCEPF Metro I, Mitsi, and Metro International referred to herein as the "Goldman Defendants."

43.     Defendant the LONDON METAL EXCHANGE LIMITED ("LME") is the world center for the trading of industrial metals and more than 80% of all non-ferrous metals futures business is transacted on the LME's trading platforms. The LME brings together participants from the physical industry and the financial community to create a market for buyers and sellers, and provides producers and consumers of metal with a physical market of last resort and the ability to hedge against the risk of rising and falling world metals prices.

44.     The LME also has a large network of storage units for its traded commodities, including aluminum. The LME is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom and does business in the United States and this District, including through holding meetings in the United States to encourage use of LME contracts, conducting storage operations through its approved warehouses that hold most of the United States' aluminum, and in multiple other ways.

45.     Defendant LME HOLDINGS LIMITED (collectively with the LME, "LME" or the "LME Defendants") is a corporation that, until December 6, 2012, owned the LME. The largest portion of LME Holdings Limited was owned by Defendant Goldman and other leading American banks including JPMorgan, Citigroup, Merrill Lynch and Morgan Stanley.

46.     On December 6, 2012, the LME was acquired by Hong Kong Exchanges & Clearing Ltd. ("HKEx").

47.     John Doe Defendants 1-10 are other persons who own warehouses, have similar financial interests as the Goldman Defendants, and have otherwise entered in the illegal conspiracy alleged herein.

48.     The LME Defendants, the Goldman Defendants, and the John Doe Defendants are sometimes hereinafter referred to as "Defendants."

### IV.     SUBSTANTIVE ALLEGATIONS

**A. Defendants' Unlawful Agreements**

49.     The LME has long provided for forward contract trading in aluminum.

50.     Prior to and after February 2010, the LME captured approximately 97-99% of the volume of aluminum forward and futures contract trading on organized exchanges in the United States.

51.     At the expiration of an LME aluminum forward contract, delivery of warrants for aluminum in a LME warehouse must be made by sellers (or "shorts") who have not liquidated (*i.e.*, traded out of their contract) to buyers (or "longs") who have not liquidated.  A warrant is the document of title to aluminum stored in an LME registered warehouse.  It takes the form of centrally-maintained electronic records under the LME's SWORD system.  Each warrant is for a specific tonnage and brand and is not interchangeable.

52.     The LME certifies, approves and makes agreements with the owners of its warehouses, including its warehouses in the Detroit, Michigan area.

53.     In February 2010, Goldman, through Defendant GS Power Holdings, purchased Defendant Metro International.  Metro owned LME Detroit warehouses with more than 80% of

the warehouse space of LME Detroit Warehousing.  Defendants Goldman and GS Power Holdings have since owned and controlled Defendant Metro International.

54.     Continuing through 2013, Goldman, through Metro International, still owned and operated 29 out of a total of 37 LME-listed storage facilities and more than 80% of the LME warehouse space in greater Detroit.

55.     Prior to Goldman's foregoing purchase, it reportedly took approximately six weeks to extract metal, including aluminum, from LME Detroit warehousing.

56.     The LME agreement with Goldman specified a minimum daily metal release of 1,500 tons per *city* per day.  This term was only 1,500 tons per day rather than a percentage per day of warehouse capacity or warehouse supply.  The 1,500 tons did **not** net out load-ins.  It applied to all the warehouses in a city rather than per *warehouse*.  Each of the foregoing aspects of this term was unreasonable.

57.     Taken together, these aspects made this term an extremely unreasonable restraint of trade.  It meant that each of Goldman's Metro International's Detroit warehouses needed to release a minimum of only 41 tons of aluminum per day.  But if, in another city, there was only one warehouse, that warehouse had to release a minimum of 1,500 tons per day.  By concentrating the warehouses in an industrial center like Detroit, this unreasonable term restrained trade in those places where aluminum was most held.  See "First Claim" *infra* alleging related restraints.

58.     Further showing unreasonableness, the absence of a per warehouse requirement and the failure to consider load-ins specifically invited a warehouse owner to shuttle aluminum from warehouse to warehouse in order to say that it satisfied the minimum.

59.     Worse, during 2010, Goldman transformed its agreement, as a warehouse owner, with the LME to make **minimum** per day per city load-outs of 1,500 tons into an agreement, in times of already high storage, to make a **maximum** load-out per day per city of 1,500 tons.

60.     The LME has continuously acquiesced, consented, and otherwise agreed to this "maximum" interpretation since 2010. *See* above regarding the percentage ownership of the LME held by Goldman, JPMorgan and other warehouse owners, and the financial incentive of the LME to participate in rent revenues. This maximum load-out agreement is a grossly unreasonable restraint of trade which greatly exacerbated the unreasonableness of the 1,500 tons **per city**.

61.     Pursuant to and as a result of Defendants' foregoing unreasonable agreements, load-outs of aluminum in the LME Detroit Warehousing occurred after February 2010 at a small fraction (1/6th – 1/20th) of the rates at which such load-outs could efficiently occur.

62.     (a) An agreement to inflate revenues and prevent access to and alienability of aluminum through gross inefficiency, in an industrial center with multiple warehouses, is inherently suspect under the law.  In the circumstances here, Defendants' agreement was extremely restrictive, anticompetitive, exclusionary, and unreasonable throughout the Class Period.

(b) Defendants engaged in the highly unusual and parallel acts of causing and permitting such extreme inefficiency.  This includes through their consensual joint implementation and interpretation of their minimum load-out agreement so as to transform it into a maximum load-out agreement.

(c) In addition to the foregoing unreasonable agreements in restraint of trade, Goldman has, according to reports in the New York Times on July 20, 2013 also done the

following. Goldman anti-competitively implemented its minimum (actually, maximum) load-out agreement with the LME in precisely the way the agreement was vulnerable to being interpreted. Reportedly, Goldman has loaded out aluminum from one LME Detroit warehouse and shipped it to another. Reportedly, this has been interpreted to satisfy Goldman's daily minimum load-out agreement (actually, maximum load-out agreement) with the LME.

(d) Thereby, Goldman's shuttling of aluminum reportedly has intentionally further delayed owners of aluminum from extracting their aluminum from the LME Detroit Warehousing. Such delays have further inflated the storage revenues of Goldman and the LME. This reported conduct also renders, at the least, misleading various statements made by Defendants about following their minimum (in reality, maximum) load-out agreement.

(e) In response to the drumbeat of repeated public complaints about Goldman's unreasonably slow load-outs since 2010, the LME has investigated warehousing (including LME Detroit Warehousing) practices and charges. This includes by retaining outside consultants and otherwise. The LME's agreement with Goldman has been vulnerable to and has subsumed and/or included---and/or the LME Defendants' abuses of their monopoly power have permitted and contributed to---Goldman's reported steps to shuttle aluminum from one warehouse to another in order to use up the daily minimum (in reality, maximum) load-out quota and release less aluminum out of the warehouse to customers.

63. **Agreeing To Restrain More Aluminum In The LME Detroit Warehousing And Inflate Prices.** (a) Subsidized and incentivized by supra-competitive revenues from its foregoing agreements and abuses of the monopoly powers alleged herein, Goldman has further restrained and distorted commerce as follows. Goldman has exacerbated the foregoing abuses by outbidding other companies in order to divert aluminum from productive uses to storage in

Goldman's LME Detroit Warehousing.  Goldman has done so by, among other things, offering incentives of as much as $250 or more per ton to store aluminum with the Goldman in long-term storage in LME Detroit Warehousing.

(b) Goldman's overbidding and incentive payments have, as a necessary and intended result, increased aluminum prices including the Midwest Premium, Platts MW Premium, and Midwest Transaction prices of aluminum IN ORDER TO divert aluminum into the LME Detroit Warehousing.

(c) The Midwest Premium or the Platts MW Premium used to be significantly less than $115 a ton and has increased to $250 per ton because of the anticompetitive actions of Defendants alleged herein.  That is, in order to cause their restraint of aluminum supply, Defendants have first had to cause and did cause substantial price inflation in the Midwest Premium or Platts MW Premium.  Thereby, Defendants have intentionally injured those who pay the MW Premium or Platts MW Premium to purchase aluminum.  This injury was inextricably intertwined with and a prior part of Defendants' restraints of trade.

(d) Goldman's payments of these incentives has benefited the LME financially by increasing the storage revenues of Goldman and the LME, by helping to enable the sale of the LME for consideration based upon such revenues (¶ 17(a)-(f)), and in other ways.

64.     More generally, the LME has financially benefitted from the shuttling, the overbidding, and the financing/storage agreements alleged above in the ways alleged in ¶ 17.

65.     By 2011, Defendants' unlawful agreement had had such deleterious effects that persons holding aluminum in LME Detroit Warehousing were being restrained, excluded and restricted from receiving their aluminum for an amount of time of approximately 180 days.  This

was the amount of time from the day of order of the load-out, when the warrant was cancelled, that it took to extract aluminum from LME Detroit Warehousing.

66.     From the beginning of 2011 until June 30, 2011 Metro International warehouses in Detroit took in 364,175 tons of aluminum and delivered out 171,350 tons.

67.     Market participants at first privately and then publicly began to complain.

68.     In 2011, a senior analyst in the metals industry told Reuters "If you take Detroit in particular, those warehouses historically extracted metal at a faster rate ... the infrastructure is there."

69.     Nick Madden the chief procurement officer for Atlanta-based Novelis, the world's largest aluminum can manufacturer noted in 2011 "I don't know the specific details of every warehouse but our view is that they seem to be able to absorb metal coming in at almost an infinite rate and so we feel there's a lot more they can do on the output side to push up the (load out) rates."

70.     "It's driving up costs for the consumers in North America and it's not being driven up because there is a true shortage in the market.  It's because of an issue of accessing metal…in Detroit warehouses," said Madden.

71.     Madden then estimated that the U.S. benchmark physical aluminum price is $20 to $40 per ton higher because of the backlog at the Detroit warehouse.  That premium was then forcing U.S. businesses to fork out millions of dollars more for the 6 million tons of aluminum they use annually.

72.     "I think it makes a mockery of the market. It's a shame," Robin Bhar, a veteran metals analyst at Credit Agricole in London said in June 2011. "This is an anti-competitive

situation. It puts (some) companies at an advantage, and clearly the rest of the market at a

disadvantage. It's a real, genuine concern. And I think the regulators have to look at it."

73.     On June 21, 2011 Jorge Vazquez, a senior vice president at Harbor Intelligence,

publicly addressed the Defendants' restrained, restricted and anticompetitively slow rate of load-

outs of aluminum from the Detroit Warehousing.

74.     Specifically, Mr. Vazquez stated that "one of the factors that, without a doubt, is

behind record high Midwest premiums" was such slow rate of load-outs.

75.     "This situation has been organized artificially to drive premiums up," said Dave

Smith, Coca-Cola's procurement manager.  "It takes two weeks to put aluminum in, and six

months to get it out."

76.     **In 2011 Coca-Cola Co.** lodged a complaint with the **LME**.  This complaint was

in response to **Goldman's** creation of supply bottlenecks to artificially raise the price of

aluminum in the open market.

77.     With full knowledge of the foregoing complaints from such powerful companies

of the upward impact that Defendants were having on the Midwest Premium or Platts MW

Premium and other prices, Defendants continued to perform their agreements and further inflated

such prices to one new record high level after another.

78.     But as monopolists frequently do, the LME Defendants made favorable

statements indicating that meaningful changes would be made to correct this problem.  These

favorable statements encouraged market participants to continue to use the LME.  And Goldman

stated that it observed its obligations under its agreement with and the rules of the LME.

79.     Precisely the opposite of acting to ameliorate the problem, the LME Defendants

and the Goldman Defendants agreed to abuse their monopoly power so as both to increase the

storage rates and INCREASE the delays in obtaining aluminum and allow the Goldman

Defendants to make purchases and diversions of aluminum so as to restrain more metal in the

LME Warehousing.

80.    (a) By the latter half of 2011, the LME began to talk about increasing the

minimum (in reality, maximum) load-out rate to 3,000 tons for LME Detroit Warehousing.  Even

while this proposal was being discussed, numerous market participants had noted that it would

not be enough to alleviate the artificial bottleneck.

(b) For example, in 2011, a senior executive at a metals brokerage told Reuters

"the recommendations won't change anything. The problem will still be there six, nine months

down the line."

81.    After more than 16 months of public complaints, the LME continued to agree

with Goldman (a) that the minimum load-out rule could be transformed into a maximum load-out

rule, (b) that there should not be a shift to a percentage of metal storage capacity in **each**

warehouse per day or per week, nor (c) netting of load-ins and (d) that there should be a per city

requirement **not** a per warehouse requirement.

82.    However, effective April 1, 2012, the LME and Goldman agreed to change the

minimum (actually, maximum) load-out to 3,000 tons per day per city for LME Detroit

Warehousing.

83.    **Agreement To Inflate Storage Charges.**  As a *quid pro quo* to Goldman for

such increase in the maximum load-out agreement, the LME agreed to increase storage rates.  In

fact, pursuant to and as a result of Defendants' agreements, the storage rental charge per ton per

day at the LME Detroit Warehouses have increased from 40 cents in 2010, to 41 cents in 2011,

to 45 cents in 2012, and a further increase is now threatened.  This 10% increase was highly

irregular, as increase the year before in storage rents was only 2%.  The storage rate was further increased to 48 cents in 2013.

(a) As a result, Defendants' listed storage charges are now much higher than competitive storage rates.

(b) Defendants actually sought to justify the extraordinary 10% increase in storage rates from 41 cents to 45 cents per ton per day in 2012 and the further 3¢ storage increase in 2013 (a 20% increase in little over a year) as a *quid pro quo* for supposed reductions in the amount of delays in the load-outs of aluminum from LME Detroit Warehousing.  However, in fact, the length of the delays in extracting aluminum from Detroit warehousing reportedly significantly increased after March 2012.

84.    Also coinciding with the increase in the minimum load-out rate effective April 1, 2012, the Goldman Defendants increased their charges for loading metal out from the Detroit Warehouses by 9% to $35.95 per ton.

85.    As the economic recovery progressed, aluminum supplies in non-Detroit Warehousing declined by 50% which was less than what normally happens during improving economic times.  This less than normal deduction was due to the deleterious influence that the Goldman – LME agreements had on non-Detroit LME Warehousing.   Defendants' agreement especially caused "water to run uphill" as the amounts of aluminum held in LME Detroit Warehousing actually increased as follows.

| End of February 2009 | 460,000 tons |
| End of February 2010 | 919,000 tons |
| End of February 2011 | 1,081,000 tons |
| End of February 2012 | 1,428,475 tons |
| End of September 2012 | 1,476,225 tons |
| End of June 2013 | 1,458,075 tons |

86.     Thus, contrary to Defendants' *quid pro quo* rationale for their increase in the storage charges that the amount in storage was going to decline, the amount in storage has not declined.

87.     In fact, as has been predicted, the backlog did not decline either.  On the contrary, according to Bloomberg, as of November 2012, withdrawals could take as long as 59 weeks in Detroit.  This is what outsiders had publicly predicted all along.  Defendants well knew and intended that this would happen in order to increase their revenues and profits, complete the sale of the LME, and for Defendants' other purposes.

88.     As complaints from the public continued, Charles Li, the CEO of HKEx, which bought the LME in June 2012, stated in October 2012 that "If people have to wait a year, that's a very big problem; it is a level-one issue.  If somehow the LME system is making clients suffer in that way, that is not acceptable."

89.     **Government Investigation.**  In November 2012, the European Union's Enterprise and Industry Directorate General started a review of the London Metal Exchange's warehousing arrangements with another EU body, the Internal Market and Services Directorate General, following complaints from the aluminum industry that load-out rates from LME-approved warehouses.

90.     During the week of January 7, 2013, the price buyers paid to obtain aluminum in the U.S. rose to a record high – the Midwest premium rose to 12 cents per pound.  The price climbed 48% over the previous 12 months.

91.      (a) Far from dissociating itself from Goldman's anticompetitive purchases and diversions agreements, the LME, per Chris Evans, peremptorily announced in New York during January 2013, that purchasers of aluminum should simply stop paying the high prices.  In effect,

the LME encouraged users to starve themselves of aluminum and lay off their workers.  This classic monopolistic and anticompetitive encouragement was unlawful because Ford, Novelis, Coca Cola and other users of aluminum do not have to further restrain trade and lay off their workers so that Defendants' unlawful agreements and abuses of their monopoly powers alleged herein, may continue.

(b) Thus, the LME Defendants have not only acquiesced in, enabled and empowered Goldman's foregoing conduct.  The LME Defendants have agreed that Goldman should engage and that the LME would support such conduct, and the LME has publicly supported same.

92.     On February 1, 2013, Novelis, the world's top maker of aluminum for beverage cans "lost patience with the LME's failure to tackle access problems at the warehouses…and says it will seek a solution elsewhere."

93.     As of February 18, 2013 reports indicated that it took more than 400 working days, to withdraw metal at the back of the queue in Detroit.

94.     Effective April 1, 2013, Goldman and the LME agreed to a further increase of 500 tons per day per city, from 3,000 to 3,500 tons.  Goldman and the LME then agreed to increase storage costs from 45 cents to 48 cents.  This represents a 6.6% increase in storage costs from 2012 to 2013 and a 20% increase in storage costs from 2010 to 2013.

95.     As of February 26, 2013 Macquarie analyst Duncan Hobbs said the 2013 change in LME rules "will make no difference to access to dominant metal stocks in critical mass locations, such as aluminum in Detroit."  Thereafter, others made similar public statements.

96.     As a result of the LME's continuing consent to Goldman, the complaints that began in late 2010 about LME Detroit Warehousing of aluminum continued into July 2013.

These include publicly reported complaints by Coca-Cola, General Motors, Novelis (which is the world's top maker of aluminum for beverage cans), PepsiCo, Anheuser-Busch, MillerCoors and others.

97.     As of June 2013, the wait for aluminum in Detroit was reportedly 469 calendar days.

98.     During June 2013, U.S. government investigations of Goldman-LME aluminum activities were threatened and efforts to have sworn testimony before Congress began.

99.     Also, in June 2013, Martin Abbott resigned as CEO of the LME.

100.    On July 1, 2013 the LME (under HKEx's ownership) proposed changes in load-out rules that would force warehouses with queues of at least 100 days (*i.e.*, Defendant Metro) to deliver metal out at a rate of at least 1,500 tons per day **more than is brought in**.

101.    Before the LME's acquisition by HKEx and while still under the leadership of CEO Martin Abbott, the LME argued that the queues were part of the economic environment and that the LME should not agree with its warehouse owners or persuade or order them, among other things, to net out incoming aluminum.

102.    As a result of all the foregoing, and the increasing government scrutiny, in early July 2013 Goldman suspended the incentive payments it made to attract metal to their LME Detroit Warehousing.

103.    In its statement on July 31, 2013, Goldman acknowledged, "In recent weeks, there has been additional focus on metals warehouses as certain end users have complained about the long wait times to get aluminum out of LME storage." http://www.goldmansachs.com/media-relations/in-the-news/current/goldman-sachs-physical-commodities-7-31-13.html   Admitting that "consumers should not have to wait unusually long times to get the metal they store in

warehouses," Goldman now claims that it will be "contacting end users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products."

104.    Goldman's Chief Operating Officer, Gary Cohn, stated on CNBC: "We feel horrible for consumers if they can't get metal." *See* http://www.cnbc.com/id/100928939 (transcript); http://video.cnbc.com/gallery/?video=3000187032&play=1 (video).  Goldman's Cohn was, however, careful claim ignorance as to actual delays and to avoid tough questions posed by reporters.

105.    Goldman announced that in order to "address any concerns that the warehouses are limiting the supply of aluminum," it will:

- "support the intent of the recently proposed rule change by the LME that will cut existing queues and prevent new queues from forming by increasing substantially the amount of daily net outflows of metal at large LME locations"

- "suggest that the LME establish a system to prioritize consumers so that they always have access to a minimum load out rate for end users"

- "support enhanced disclosure at the LME, including with respect to who owns the warrants for metals and to designate by broad market participant category who is in the queue.

106.    Goldman's professed feeling and promises are contrary to Defendants conduct from 2010 until July 2013.

107.    Either the Goldman Defendants, on their own, or the LME Defendants, on their own, could since late 2010 or early 2011 have quickly have responded to these public complaints

about, and could have ended Defendants' upward impact on aluminum prices, including the Midwest Premium or Platts MW Premium prices.

108.     For example, Goldman could quickly have lifted its artificial restraints on load-outs from its Detroit Warehousing.  For another example, as part of its approval of warehouses and/or its minimum load-out rule requirements, the LME Defendants could easily have taken multiple steps.

109.     Only by working cooperatively together in agreement as alleged herein, have Defendants, through their parallel individual and joint or mutual conduct, been able to continue to inflate prices and storage costs to their continued mutual profit.

110.     The LME and Goldman do not have discretion to agree to increase storage rates in order to maintain supra-competitive revenues that were being generated by prior unlawful restraints of trade.

**B.  The LME Defendants' Monopoly Power**

111.     The LME Defendants have had monopoly power in the Relevant Markets alleged at ¶¶ 116-118.  The LME controlled between 97-99% of the aluminum forward and futures contract trading in the United States during the Class Period. Competitors have been unable successfully to start competing contracts because of the agreements that the LME Defendants make with the Goldman Defendants and others that incentivize the intermediaries to direct business to the LME Defendants.  The LME Defendants have the ability to control the output of aluminum from the LME approved warehouses and the storage rates of such LME approved warehouses.

112.     LME has the right to approve any LME warehouse, including in the U.S., and has a monopoly control over selection of the warehousing for exchange-traded aluminum in the U.S.

113.   The LME also has monopoly power over approving exchange-traded warehouses in the Detroit, Michigan area.

114.   The foregoing monopoly power extends to approving storage rates, load-out rates and other matters.

115.   With knowledge since late 2010 or early 2011 of public complaints that they were inflating aluminum prices, the LME Defendants have abused their monopoly power as alleged herein.  This includes but is not limited to, by not basing their agreements with warehouse owners and the minimum load-out rates on a percentage of the metal capacity or metals stored in each warehouse by not requiring netting of incoming aluminum; by using anti-competitively low minimum load-out rates; by consenting to the conversion of the minimum rates to maximum rates in times of anomalously high storage; by repeatedly investigating and approving the Goldman Defendants' charges and practices; by allowing repeated increases in the Goldman Defendants' charges; by allowing the Goldman Defendants to pay incentives to divert into, and restrain and engross more aluminum in LME Detroit Warehousing; by making statements to deter companies that purchased aluminum from challenging such practices; by allowing Goldman to shuttle, or making agreements that encouraged Goldman to shuttle and that subsumed Goldman's shuttling aluminum from warehouse to warehouse and by the other steps alleged herein.

### C.  The Goldman Defendants' Monopoly Power

116.   Goldman has had monopoly power in the Relevant Markets alleged in Goldman warehouses with 80-plus percent of the LME Detroit Warehousing space.  Goldman can control the output of LME approved aluminum from LME Detroit Warehousing by controlling the rate at which Goldman loads-out aluminum above the agreed upon minimum load-out rate.

117.   With knowledge from public complaints since 2010 or early 2011 that it was inflating aluminum prices, Goldman has converted the minimum output into a maximum and agreed with the LME to convert the minimum into a maximum.  Goldman reportedly further abused such power by shuttling aluminum from one warehouse to another within the Detroit area in order to use up the minimum quota without actually causing any output of aluminum from the warehouses to the public.  Subsidized and incentivized by its monopoly profits from its foregoing abuses, Goldman has made diversion agreements in which it has paid as much as $250 per ton or more to divert more aluminum into the LME Detroit Warehousing.

118.   Goldman has abused its monopoly power, the LME has abused its monopoly power, and Goldman and the LME have agreed to abuse their monopoly power in order anti-competitively and restrictively to divert aluminum into and limit unreasonably the free alienability of aluminum stored, in LME Detroit Warehousing.  Thereby Defendants have inflated aluminum prices including the Midwest Premium or Platts MW Premium price as well as the storage costs paid directly to the Goldman Defendants, part of which is paid to the LME.

119.   Unless enjoined as alleged herein, Defendants ongoing agreement in restraint of trade and abuse and conversion of their monopoly power will spread to other LME warehouses, further exacerbating the anticompetitive impact on the U.S. economy.

### V.   RELEVANT MARKET

120.   Plaintiff disclaims any need to plead a relevant market on the Section 1 claim because the restraint of trade here directly inflated price, restricted supply, anti-competitively restrained free alienability of aluminum, and otherwise constitutes a *per se* violation of Section 1.

121.   **LME Defendants**.  The relevant markets are, in the alternative, one or more of the following:

(a) The market for providing exchange traded aluminum forward or futures contracts, including to approved warehouses for exchange-traded aluminum in the United States. The LME has had 97-99% of the aluminum futures contract trading and has had the power to approve the warehouses holding 95-100% of the aluminum for such trading.

(b) The market for warehouse storage of aluminum in the United States in LME warehouses or, in the alternative, the market for warehouse storage of that portion of both LME warehouse aluminum and non-LME warehouse aluminum that is located in areas in which purchase and sale contracts for aluminum are based on the Midwest Premium or the Platts MW premium price.  The growing amount of aluminum in the LME warehouses in the United States is estimated to constitute approximately 50% or more of the fluctuating total amounts of aluminum stored by warehouses in the United States. That percentage is even higher for aluminum stored in places that transact at Midwest Premium or Platts MW premium prices.

(c) The LME has the power to control or agree to the terms and operations of its warehouses that hold all the LME aluminum in the U.S.  Such warehouses also hold a large portion of all LME and non-LME aluminum stored by warehouses in the U.S. The geographical market for the foregoing product markets is the entire United States or, in the alternative, is that part of the United States that prices its aluminum on the Midwest Premium or Platts MW premium, i.e., Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, contiguous and other areas.

122.    **Relevant Market For the LME Defendants and the Goldman Defendants**. (a) The market for warehousing LME aluminum in the Detroit Michigan area or, in the alternative, for warehousing all LME and non-LME aluminum in the Detroit area or, in the alternative, for

warehousing aluminum in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, contiguous and other areas in which aluminum is purchased and sold based on the Midwest Premium or the Platts MW premium.  The alternative geographical markets are the same as those contained in the alternative definitions of the product market.

123.    Pursuant to its agreement with the LME, Goldman has gone into the market in which Plaintiff and other Class members purchased aluminum at the Midwest Premium or Platts MW premium price, and has inflated prices in that market through Goldman's diversion agreements. After and during such price increases, Goldman has restrained and pulled out of those markets significant supplies of aluminum which Defendants have restrained in LME Detroit Warehousing.

## VI.   EFFECTS ON INTERSTATE COMMERCE AND INJURY TO PLAINTIFF AND CLASS MEMBERS

124.    Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

125.    Defendants' unlawful acts alleged herein have had a substantial anticompetitive effect on interstate commerce within the United States including by inflating aluminum prices, restraining aluminum, reducing the effective availability of the supplies of aluminum in LME Detroit Warehousing and beyond.

126.    For one example, Defendants' unlawful agreement has caused purchasers of aluminum in the United States whose purchase contracts specify the Midwest Premium or the Platts MW Premium, as a component of the purchase price under the contract, to pay an unlawfully inflated and anomalously increasing premium to purchase aluminum.

127.    As a direct result of Defendants' violations, Plaintiffs and the members of the Class have been damaged in their property or business, and have paid supra-competitive prices.

33

## VII.    ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFF AND THE CLASS

128.    The Defendants' restraint of trade and anticompetitive conduct had severe adverse consequences on competition, prices, the quality of storage services, efficiency in storage services, and the level of available output of aluminum.  Plaintiff and other members of the Class were deprived of normal, competitive aluminum prices.  Instead, they were subjected to artificially determined prices and price trends as a direct, foreseeable and intended result of Defendants' unlawful and manipulative conduct.  As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

## VIII.   CLASS ALLEGATIONS

129.    Plaintiff brings this action on behalf of Plaintiff, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons who from February 1, 2010 forward purchased aluminum pursuant to a contract with a price term based, in **any** part, on the Midwest Premium or Platts MW Premium or similar terminology, including but not limited to an averaging over a period of days of any such premium.
>
> Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.[2]

130.    The Class is so numerous that joinder of all members is impracticable.  Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States.  The number and identity of Class members is unknown to Plaintiff, but can be readily ascertained.  Plaintiff believes that there are hundreds of the Class.

---

[2] Plaintiff reserves the right to amend the definition of the Class in the class motion or otherwise.

131.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

   a.   Whether Defendants monopolized, attempted to monopolize or conspired to monopolize in violation of law;

   b.   Whether Defendants made agreements in unreasonable restraint of trade;

   c.   Whether Defendants combined, conspired and agreed to restrain supplies or inflate prices of aluminum, including the Midwest Premium, or Platts MW Premium portion thereof;

   d.   Whether such violations inflated such prices of aluminum;

   e.   Whether such inflation caused antitrust injury to the property of Plaintiff and Class members;

   f.   Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

   g.   Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

132.    Plaintiff's claims are typical of the claims of the other members of the Class it seeks to represent.  Plaintiff and members of the Class all sustained damages arising out of Defendants' same course of unlawful conduct alleged herein.

133.    Plaintiff will fully and adequately protect the interests of all members of the Class.  Plaintiff has retained counsel experienced in complex antitrust class actions including involving exchange markets.  Plaintiff has no interests which are adverse to or in conflict with other members of the Class.

134.    The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

135.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated.  It would do so without sacrificing procedural fairness or bringing about other undesirable results.

136.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  Plaintiff anticipates no difficulty in the management of this action as a class action.

**AS AND FOR A FIRST CLAIM
AGAINST DEFENDANTS FOR
VIOLATIONS OF SECTION 1 OF THE
SHERMAN ACT**

137.    Plaintiff incorporates by reference the preceding allegations.

138.    In violation of Section 1 of the Sherman Act, Defendants entered an agreement in unreasonable and extreme restraint of trade which intentionally, directly and foreseeably inflated prices for aluminum in the United States, including, the Midwest Premium or Platts premium component of prices.  This, in turn, inflated the price of aluminum products.

139.    Defendants' conduct constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

140.    The Defendants agreed to and did abuse their respective monopoly powers over essential areas of commerce involving warehousing and futures trading.

141.    Defendants made the foregoing agreements in order to engage in the anticompetitive conduct alleged herein, inflate aluminum prices, including the Midwest Premium or Platts MW Premium prices of aluminum, and thereby inflate Defendants' profits and revenues.  Defendants' agreements did so, and unreasonably restrained trade.

142.    Defendants' agreements constituted unreasonable restraints of trade for many reasons, including the following

(a) **<u>Diversion Agreements</u>**.  In order to restrain aluminum supplies in LME Detroit Warehousing, Goldman first had to overbid and drive up prices in the markets for physical aluminum that were based upon the Midwest Premium or Platts MW Premium.  As repeated public complaints told Defendants, Defendants' diversion agreements and other steps were inflating the Midwest Premium to all time record levels in order to attract aluminum in LME Detroit Warehousing.  That is, Defendants first injured and made targets of purchasers of aluminum at the Midwest Premium or Platts MW Premium price, in order to ship more aluminum into and restrain it in Detroit LME Warehousing.

(b) **<u>Inefficiency Agreements</u>**.  Defendants established a load-out minimum on a per city rather than a per warehouse basis such that, in industrial centers, the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

(c) Defendants established the minimum load-out based upon an absolute number rather than percentage of capacity of the warehouses, or percentage of the supply in the

warehouse basis.  Thus, in industrial centers the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

(d) Defendants established a minimum load-out based upon a gross number rather than a net number that subtracted load-ins. Thus, the agreement could be perverted into self-perpetuating feedback loops of greater and greater backlogs and longer storage times.

(e) Defendants agreed to transform the minimum load-out requirement, in times of high storage, into a maximum load-out requirement.  Thereby, in commercial centers the agreements could be perverted into self-perpetuating feedback loop of greater load-out backlogs and longer storage times.

(f) Defendants agreed to a maximum load-out rate that was $1/6^{th} - 1/20^{th}$ of an efficient rate of load-outs such that Goldman and the LME could be rewarded for extreme inefficiency with the longer duration of storage revenues from each customer. Thereby, they could leverage such inefficiency into a self-perpetuating feedback loop of greater load-out backlogs and longer storage times.

(g) Defendants agreed to terms that allowed Goldman to subvert even the extremely unreasonably high maximum load-out agreement, by shuttling aluminum back and forth from warehouse to warehouse.

(h) Defendants agreed to storage rates that were much higher than competitive storage rates and further agreed that *quid pro quo* increases in storage rates to even higher supra-competitive levels would be made in order to compensate for any reduction in the extreme unreasonableness of the minimum (in reality, the maximum) load-out rate.

(i) Defendants agreed to leverage their supra-competitive revenues obtained from all the foregoing by Goldman's diversion agreements alleged in (a) above, which further added

to the aluminum in storage in LME Detroit Warehousing.  Thereby, in industrial centers, Defendants' agreements could be further perverted into self-perpetuating feedback loops of greater load-out backlogs, longer storage times, and cause continually higher aluminum prices.

(j) Defendants agreed, as a necessary, intended and direct effect and inextricably intertwined part of their foregoing conduct, to inflate prices for aluminum including the Midwest Premium or Platts MW Premium component of the aluminum price.  Defendants inflated such prices to increasingly higher all-time record levels in an economic environment in which such levels made absolutely no sense whatsoever.

143.    As a direct and foreseeable result, Plaintiff and Class members were injured in their property including that they had to pay artificially high Midwest Premium or Platts MW Premium prices for aluminum.  Absent injunctive relief, these violations may continue or reoccur in the future.

**AS AND FOR A SECOND CLAIM
AGAINST DEFENDANTS FOR
VIOLATIONS OF SECTION 2 OF THE
SHERMAN ACT**

144.    Plaintiff incorporates by reference the preceding allegations.

145.    In violation of Section 2 of the Sherman Act, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein.

146.    The Goldman Defendants have abused their monopoly power.  The LME Defendants have abused their monopoly power. The Goldman Defendants and the LME Defendants have agreed with one another and other Defendants, to abuse their monopoly power. They have done so in order anticompetitively and restrictively to limit unreasonably the free

alienability of aluminum stored in Detroit warehousing and, thereby, inflate aluminum prices as well as the storage costs paid directly to Defendants.

147.    This conduct and its resulting impact on the market, occurred in or affected interstate commerce.

148.    As a direct and foreseeable result, Plaintiff and Class members have been injured in their property in that they had to pay artificially high prices for aluminum. Unless injunctive relief, including structural injunctive relief is granted, these violations may continue or reoccur in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

(B)      For an order enjoining Defendants' challenged conduct, and declaring and adjudging that such conduct is unlawful

(C)     For a judgment awarding Plaintiff and the Class damages against Defendants as a result of Defendants' unlawful conduct alleged herein, including treble damages and all other available damages whether punitive, exemplary or otherwise;

(D)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)     For any other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury on all issues so triable as well as those issues which an advisory jury may be appropriate.

Dated:          November 20, 2013

Respectfully submitted.

**GRANT & EISENHOFER P.A.**

By: _/s/ Linda P. Nussbaum_
Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
Email: lnussbaum@gelaw.com
           pbarile@gelaw.com

Christopher Lovell
Benjamin M. Jaccarino
Amanda N. Miller
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4677 (fax)
Email: clovell@lshllp.com
           bjaccarino@lshllp.com
           amiller@lshllp.com

Craig Essenmacher
Keith Essenmacher
LOVELL STEWART HALEBIAN
JACOBSON LLP
162 E. Main Street
Northville, MI 48167

Tel: (248) 615-1752
Fax: (248) 928-0909
Email: cessenmacher@lshllp.com
        kessenmacher@lshllp.com

Harold Z. Gurewitz
GUREWITZ & RABEN, PLC
333 West Fort Street, Suite 1100
Detroit, Michigan  48226
Tel: (313) 628-4733
Fax: (313) 628-4701
Email: hgurewitz@grplc.com